UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

*JUDGE RAKOFF*



| | |
|---|---|
| KAREN RULISON and JOSEPH RULISON, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>ABN AMRO MORTGAGE GROUP, INC., CITIMORTGAGE, INC. (as successor in interest by merger to ABN AMRO MORTGAGE GROUP, INC.), CITIGROUP INC., AAMBG REINSURANCE, INC., UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY, MORTGAGE GUARANTY INSURANCE CORPORATION, GENWORTH MORTGAGE INSURANCE CORPORATION, REPUBLIC MORTGAGE INSURANCE COMPANY, RADIAN GUARANTY INC., and TRIAD GUARANTY INSURANCE CORPORATION,<br><br>        Defendants. | Civ. Action No. _____<br><br>**CLASS ACTION COMPLAINT** |

**12 CV 3094**

## INTRODUCTION

1.    This is a proposed nationwide class action brought by Plaintiffs Karen Rulison and Joseph Rulison (together, "Plaintiffs") on behalf of themselves and a class of all other similarly situated persons who: (i) obtained residential mortgage loans originated by, funded by and/or originated through correspondent lending by ABN AMRO Mortgage Group, Inc. or any of its subsidiaries and/or affiliates between January 1, 2004, and the present (the "Class Period"), (ii) in connection therewith, purchased private mortgage insurance ("PMI"), and (iii) whose residential mortgage loans were included within ABN AMRO Mortgage Group, Inc.'s captive mortgage reinsurance arrangements (hereinafter, the "Class").

2.      Captive reinsurance schemes – such as the scheme involving Defendants described herein – have been widespread, though clandestine, throughout the mortgage lending industry.  As *American Banker* magazine recently reported, an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD") has revealed that, "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk." *See* Jeff Horowitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction*, American Banker (Sept. 16, 2011), attached hereto as Exhibit 1 (hereinafter referred to as "*Mortgage Kickback Scheme*")[1]; *see also* Jeff Horowitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say,* American Banker (Sept. 6, 2011), attached hereto as Exhibit 2 (hereinafter referred to as "*Reinsurance Kickbacks*")[2].

3.      Defendants ABN AMRO Mortgage Group, Inc., CitiMortgage, Inc., Citigroup Inc., and their affiliated or "captive" reinsurer, AAMBG Reinsurance, Inc. ("AAMBG Reinsurance") (collectively, "ABN AMRO Mortgage"), have acted in concert with Defendants United Guaranty Residential Insurance Company, Mortgage Guaranty Insurance Corporation, Genworth Mortgage Insurance Corporation, Republic Mortgage Insurance Company, Radian Guaranty Inc., and Triad Guaranty Insurance Corporation (collectively, the "Private Mortgage Insurers") (together with ABN AMRO Mortgage, "Defendants") to effectuate an illegal captive reinsurance scheme, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA").   The scheme described herein violates RESPA because:   (a) illegal referral

---

[1]      Available at: http://www.americanbanker.com/issues/176_181/mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html.

[2]      Available at: http://www.americanbanker.com/issues/176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html.

payments disguised as purported reinsurance premiums were paid by the Private Mortgage Insurers to AAMBG Reinsurance; and (b) AAMBG Reinsurance received an unlawful split of private mortgage insurance premiums paid by ABN AMRO Mortgage's customers. As detailed below, the scheme violates RESPA without regard to any "overcharge" experienced by Plaintiff or the Class, who are statutorily entitled to a real estate closing process free from any kick-backs or secretive side-dealing.

4.     The captive reinsurance scheme was accomplished through a secretive "pay-to-play" arrangement that utilized carefully crafted "excess-of-loss" or *purported* "quota-share" reinsurance contracts that minimized and/or eliminated any real risk exposure to the bank, which was assigned nominal risk to certain bands of losses that were unlikely or impossible to pierce, as described in greater detail below.

5.     Even with regard to the purported band of exposure, certain lenders, including ABN AMRO Mortgage, insulated themselves from any real risk by: (a) making their captive reinsurance arrangements "self-capitalizing," in that they were required to put only "nominal initial capital" into trusts supporting reinsurance contracts, and (b) providing no recourse for the failure to adequately fund the trusts. *See Mortgage Kickback Scheme.*

6.     As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses. In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs.

*Id.* at 2.

3

7.      The lenders – including ABN AMRO Mortgage – were essentially "playing with the house's money," and had no real risk of meaningful losses. That is not reinsurance. It is an illegal kick-back. As *American Banker* aptly explained:

> If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them by their mortgage insurance partners. In other words, it appeared to be a no-lose proposition for the banks.

*Id.*

8.      Where the reinsurance contract is structured so that the reinsurer will **never** be required to pay from its own capital, there is no reasonable expectation that the reinsurer will **ever** experience any true reinsurance losses. In such cases, the structure and missing essential terms of the reinsurance contracts themselves negate any exposure to reinsurance losses. That arrangement does not describe reinsurance, but rather, an illegal kick-back to the lenders.

9.      In this action, Plaintiffs challenge Defendants' hidden scheme to circumvent RESPA's strict prohibition against kick-backs, referral payments and unearned fee splits. Plaintiffs seek statutory damages and/or restitution for Defendants' unjust enrichment. Each Defendant named herein was – and may continue to be – a member of the kick-back scheme.

10.     Plaintiffs contend that, due to the *structure* of Defendants' captive reinsurance arrangements described below, and the essential terms missing therein, such arrangements were a sham and in violation of RESPA.

11.     These sham transactions constitute disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

4

12.     Defendants have been unjustly enriched, as detailed below.   In addition to statutory damages under RESPA, Plaintiffs seek full disgorgement and restitution of Defendants' unjust enrichment, benefits, and ill-gotten gains acquired as a result of their unlawful or wrongful conduct, as well as seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## An Overview of RESPA as it Relates to PMI

13.     Homeowners who buy a home with less than a 20% down payment are typically required by the lender to pay for private mortgage insurance. *See* http://www.privatepmi.com. Private mortgage insurance protects the lender in the event of a default by the borrower. *Id. See also* Exhibit 3 attached hereto at 1, Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements," discussing the purpose of private mortgage insurance. Although the premium is paid by the borrower (either directly or indirectly, as further described below), borrowers typically have no opportunity to comparison-shop or select the provider of the private mortgage insurance. *See, e.g.*, *Reinsurance Kickbacks* at 2-3 ("Banks typically choose the insurance carrier, but borrowers pay for the coverage in the form of higher net mortgage payments.").

14.     Section 2607(a) of RESPA specifically prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.  Thus, a lender cannot legally accept a referral fee from the private mortgage insurer issuing the policy on the borrower's loan.

15.     Similarly, Section 2607(a) of RESPA also prohibits providers of private mortgage insurance from giving kickbacks or referrals fees to providers of real estate settlement services,

5

including mortgage lenders and their affiliates. Thus, a private mortgage insurer cannot lawfully pay referral fees to lenders or lenders' affiliates, including lenders' captive reinsurers.

16.     Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee – including amounts paid by borrowers for private mortgage insurance – from any person providing a real estate settlement service, including providers of private mortgage insurance, other than for services actually performed. Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home.

17.     Similarly, Section 2607(b) of RESPA prohibits providers of private mortgage insurance from giving any portion of a settlement service fee – including amounts paid by borrowers for private mortgage insurance – to providers of real estate settlement services, including lenders and their affiliates, other than for services actually performed. Accordingly, it is unlawful for providers of private mortgage insurance to pay unearned fee splits to lenders and their affiliates.

### The Illegal Scheme

18.     Pursuant to the kick-back scheme, each Private Mortgage Insurer pays a portion of the borrowers' private mortgage insurance premiums to AAMBG Reinsurance in the purported form of "reinsurance" premiums. While these payments to AAMBG Reinsurance are disguised as payments for reinsurance services, AAMBG Reinsurance receives these payments while assuming very little or no actual risk under its contracts with the Private Mortgage Insurers.

6

19.     For example, from the beginning of 2004 through the end of 2008, AAMBG Reinsurance collected over **$150 million** from Private Mortgage Insurers as its "share" of the borrowers' PMI premiums.

20.     In contrast, AAMBG Reinsurance's "share" of paid claims during this time period was zero.[3]  *See* Schedule F – Part 3 from the 2004-2008 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by AAMBG Reinsurance).

21.     Defendants' scheme was designed to circumvent RESPA's prohibition against kickbacks, referral payments and unearned fee splits, and violates Sections 2607(a) and (b).

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

23.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because certain Defendants reside in this district and/or a substantial part of the events giving rise to the claims occurred in this district.

### Plaintiffs

24.     Plaintiffs Karen Rulison and Joseph Rulison obtained a mortgage loan from ABN AMRO Mortgage Group, Inc. on or about February 20, 2007, for the purchase of their property located in South Bristol, NY.  In connection with their loan, Plaintiffs were required to pay for

---

[3]     As further described below, the fact that AAMBG Reinsurance later experienced some "paid claims" does not mean that AAMBG Reinsurance actually assumed any risk of loss or experienced any losses. In fact, AAMBG Reinsurance's reinsurance contracts were carefully crafted to ensure that AAMBG Reinsurance would not experience any true reinsurance losses.

7

private mortgage insurance in the amount of $139.81 per month. Their Private Mortgage Insurer, Mortgage Guaranty Insurance Corp., was selected by their lender and was a provider with whom their lender had a captive reinsurance agreement.

**Bank Defendants**

25.     Defendant ABN AMRO Mortgage Group, Inc., formerly a subsidiary of LaSalle Bank Corporation and ABN AMRO Bank, N.V., was acquired by Defendant Citigroup Inc. on or about March 1, 2007.

26.     Defendant CitiMortgage, Inc., a subsidiary of Defendant Citigroup Inc., is a New York corporation with headquarters in O'Fallon, Missouri. Defendant CitiMortgage, Inc. is the successor-in-interest to Defendant ABN AMRO Mortgage Group, Inc.[4]

27.     Defendant Citigroup Inc. is a Delaware Corporation with headquarters in New York, NY.

28.     Defendant AAMBG Reinsurance, Inc. is a Vermont corporation and a subsidiary of Citigroup Inc.

**The Private Mortgage Insurer Defendants**

29.     Defendant United Guaranty Residential Insurance Company is a North Carolina corporation headquartered in Greensboro, NC, and, during the Class Period, conducted business throughout the United States.

30.     Defendant Mortgage Guaranty Insurance Corporation is a Wisconsin corporation headquartered in Milwaukee, WI, and, during the Class Period, conducted business throughout the United States.

---

[4]      Defendant CitiMortgage has identified itself as successor in interest to ABN AMRO Mortgage Group, Inc., in numerous publicly-available court filings.

31.     Defendant Genworth Mortgage Insurance Corporation is a North Carolina corporation headquartered in Raleigh, NC, and, during the Class Period, conducted business throughout the United States.

32.     Defendant Republic Mortgage Insurance Company is a North Carolina corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business throughout the United States.

33.     Defendant Radian Guaranty Inc. is a Pennsylvania corporation headquartered in Philadelphia, PA, and, during the Class Period, conducted business throughout the United States.

34.     Defendant Triad Guaranty Insurance Corporation is an Illinois corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business throughout the United States.  Defendant Triad Insurance Corp. purportedly ceased issuing commitments for new business on July 15, 2008 and entered into voluntary run-off.  See http://www.tgic.com.

35.     Each Defendant is a proper party to this action as, upon information and belief, each Defendant participated in the scheme alleged herein and was a provider or recipient of the unlawful kickbacks and unearned fees described herein.  Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§ 2607(a) and (b), it is unlawful for any person to give or accept any fee, kickback, or thing of value for the referral of private mortgage insurance or any portion of an unearned fee.

36.     Further, Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated persons

who: (i) obtained residential mortgage loans originated by, funded by and/or originated through correspondent lending by ABN AMRO Mortgage Group, Inc., or any of its subsidiaries and/or affiliates between January 1, 2004 and the present (the "Class Period"), (ii) in connection therewith, purchased private mortgage insurance ("PMI"), and (iii) whose residential mortgage loans were included within ABN AMRO Mortgage's captive mortgage reinsurance arrangements (the "Class").

38.    The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

39.    The Class is so numerous that joinder of all members is impracticable.

40.    A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiffs' claims.

41.    Plaintiffs' claims are typical of the claims of the Class.

42.    There are questions of law and fact common to the Class, including but not limited to:

    a)    Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

    b)    Whether payments to ABN AMRO Mortgage's captive reinsurer were *bona fide* compensation and solely for services actually performed;

    c)    Whether payments to ABN AMRO Mortgage's captive reinsurer exceeded the value of any services actually performed;

    d)    Whether ABN AMRO Mortgage's captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

e)    Whether ABN AMRO Mortgage accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

f)    Whether the Private Mortgage Insurers paid or gave referral fees to ABN AMRO Mortgage, or gave a portion, split or percentage of borrowers' private mortgage insurance premiums to ABN AMRO Mortgage other than for services actually performed; and

g)    Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA§ 2607(d)(2) equaling three times the premiums received for purported PMI reinsurance during the Class Period.

43.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members. The basic terms and contours of Defendants' captive reinsurance arrangements at issue here are not tied to any specific, individual consumer loan. Rather, the captive reinsurance arrangements apply to groups or pools of loans. Further, each and every Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining their ABN AMRO Mortgage loan, to pay for private mortgage insurance.

44.    Each and every Class member was directed to obtain private mortgage insurance from one of the Defendant Private Mortgage Insurers – each of whom had reinsurance contracts with AAMBG Reinsurance, structured, as challenged here, to purportedly purchase "reinsurance" on that private mortgage insurance. The essential and basic terms of each of those "reinsurance" contracts between AAMBG Reinsurance and the Defendant Private Mortgage

11

Insurers were, for all intents and purposes, materially the same – and each of the Class members, no matter the Private Mortgage Insurer to whom they were referred, suffered the same harm, entitling them to identical statutory damages. Accordingly, this is the quintessential consumer class action lawsuit.

45.    The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded by ABN AMRO Mortgage or originated through correspondent lending.   Regardless of whether ABN AMRO Mortgage or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as described herein.

46.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including consumer class actions such as this. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

47.    Class action status is warranted pursuant to Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

48.    Class action status is also warranted pursuant to Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

49.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### ABN AMRO Mortgage Group, Inc.'s Operations

50.     Prior to its acquisition by Citigroup Inc., ABN AMRO Mortgage Group, Inc., was one of the largest loan originators in the United States and operated as a subsidiary of LaSalle Bank Corporation and ABN AMRO, N.V.

51.     ABN AMRO Mortgage Group, Inc., originated mortgage loans through multiple channels throughout the United States, including, without limitation, its wholesale and correspondent division, the retail branch network and Web site of LaSalle Bank, InterFirst Wholesale Mortgage Lending and the internet website www.mortgage.com.

52.     On or about March 1, 2007, Citigroup Inc. purchased ABN AMRO Mortgage Group, Inc., including $12 billion in assets and $3 billion of mortgage servicing rights. As a result of the acquisition, CitiMortgage received approximately 1.5 million new customers. *See* Citigroup Inc., Quarterly Report (Form 10-Q), May 5, 2007, at 9.

53.     AAMBG Reinsurance was acquired by Citigroup Inc. in connection with its acquisition of ABN AMRO Mortgage Group, Inc., and purportedly provides mortgage reinsurance with respect to loans originated by ABN AMRO Mortgage Group, Inc. and its affiliates.

**Private Mortgage Insurance Industry**

54.     Each of the Defendant Private Mortgage Insurers provides or provided mortgage insurance for the protection of residential mortgage lenders including ABN AMRO Mortgage and, during the Class Period, was a party to a captive reinsurance agreement with ABN AMRO Mortgage.

55.     The private mortgage insurance industry began with the founding of Defendant Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and grew to become dominated by MGIC and the other Defendant Private Mortgage Insurers, including United Guaranty Residential Insurance Company, PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Republic Mortgage Insurance Company, Radian Guaranty Inc., and Triad Guaranty Insurance Corporation. Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA"). *See* http://www.privatemi.com/index.cfm. According to its website, MICA's members include each of the foregoing insurers, with the exception of Triad Guaranty Insurance Corp. and United Guaranty Residential Insurance Co. *See* http://www.privatemi.com/about.cfm.

56.     According to MICA, new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007. *See* MICA 2011-2012 Fact Book & Member Directory, available at: http://www.privatemi.com/news/factsheets/2011-2012.pdf, at 27, attached hereto as Exhibit 4. By the end of 2010, MICA's member companies had over $635 billion of private mortgage insurance in force. *Id.*

57.     In order to reduce the risk of default, lenders prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%) being paid as a

down payment by the borrower. In the event of a default, the lender is then more likely to completely recover its investment.

58.     However, many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home. Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party – the provider of private mortgage insurance – to protect the lender in the event of a default by the borrower. The borrower's monthly mortgage payments are then increased by the amount of the premiums paid to the private mortgage insurer.

59.     Private mortgage insurance providers are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses. *See* Exhibit 3 at 1-2; *see also* Exhibit 4 at 22.

60.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default. The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required. For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

61.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan – where the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan.

15

62.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance, as private mortgage insurance is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of private mortgage insurance according to master policies issued to the lender, rather than negotiated between the borrower and the provider of private mortgage insurance. *See, e.g.,* Exhibit 4 at 22-23; *see also Reinsurance Kickbacks* at 2 ("Banks typically choose the insurance carrier….").

63.     Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration ("FHA"), the Department of Veterans Affairs and the Department of Agriculture maintain their own form of mortgage default insurance.

**RESPA Prohibits Kickbacks for Referrals and
Fee-Splitting Related to Private Mortgage Insurance Policies**

64.     RESPA is the primary federal law regulating residential mortgage settlement services and/or business incident to real estate settlement services.   The United States Department of Housing and Urban Development ("HUD") is charged with enforcing RESPA, although certain sections of the statute, including Section 2607, provide for a private right of action. HUD has promulgated the implementing rules for RESPA. *See* Regulation X, 24 C.F.R. § 3500.

65.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers and/or providers of business incident to real estate settlement services. "It is the purpose of this Act to effect certain changes

in the settlement process for residential real estate that will result…in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

66.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

67.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

68.    RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

69.    Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

70.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> [W]ithout limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…. The term "payment" is used…as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

71.     Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service," within the meaning of RESPA, 12 U.S.C. § 2607(a). The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "[p]rovision of services involving mortgage insurance." 24 C.F.R. § 3500.2(b).

72.     Therefore, under RESPA: (a) ABN AMRO Mortgage was prohibited from accepting referral fees from a Private Mortgage Insurer or from splitting private mortgage insurance premiums with the Private Mortgage Insurer other than for services actually performed by the captive reinsurer; and (b) the Private Mortgage Insurers were prohibited from paying referral fees to ABN AMRO Mortgage or from paying to ABN AMRO Mortgage any split of private mortgage insurance premiums other than for services actually performed by the captive reinsurer.

### Mortgage Reinsurance

73.     Beginning in the mid to late 1990s, lenders began looking for ways to capitalize on the booming profitability of the private mortgage insurance market. *See* Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance,* (Mar. 23, 1998), http://www.captive.com/service/milliman/article3_mortgage.shtml, attached hereto as Exhibit 5.

74.     In order to "share in these profits," lenders typically create reinsurance subsidiaries to enter into contracts with providers of private mortgage insurance, whereby the reinsurer agrees to purportedly assume a portion of the private mortgage insurer's risk with respect to a given pool of loans. *See Mortgage Kickback Scheme* at 1 ("Beginning in the late

18

1990s major U.S. banks began coercing insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk....").  In return for guaranteeing a steady stream of business through the lender's referral of borrowers, the private mortgage insurer cedes to the lender's affiliated reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

75.    Mortgage reinsurance arrangements can generally take one of two forms:   (a) "quota share," or (b) "excess-of-loss."

76.    In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses. Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance contract.

77.    Notably, however, "quota share" arrangements *do not constitute real or commensurately priced reinsurance* if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer. It is these trusts into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers. Thus, the Private Mortgage Insurers have no recourse against the reinsurer beyond what has already been deposited by them into the trusts. Accordingly, the "reinsurer" has actually taken on no out of pocket risk. As the American Academy of Actuaries Committee on Property and Liability Financial Reporting has stated:

> Straight quota-share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113. However, the *introduction of risk limiting features to a quota share contract, such as a loss ratio cap* (other than one that is so high its effect is de minimus), a loss retention corridor, or a

sliding scale commission, often prevents the contract from
qualifying for the exception.

*See* American Academy of Actuaries Committee on Property and Liability Financial Reporting,

Reinsurance Attestation Supplement 20-1: Risk Transfer Testing Practice Note (November

2005), attached hereto as Exhibit 6 (emphasis added).  Upon information and belief, quota share

mortgage reinsurance contracts entered into by ABN AMRO Mortgage contained such risk

limiting features.

78.    In contrast to the typical quota share arrangement, where the private mortgage

insurer and reinsurer are expected to share losses beginning with the first dollar of loss paid, in

an "excess-of-loss" arrangement, the reinsurer is liable only for a specified corridor or "band" of

loss, with the losses below and above the band being covered by the private mortgage insurer.  In

other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular

point, commonly known as an attachment or entry point, and subject to a ceiling, commonly

known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if

ever, only when the private mortgage insurer's incurred losses reach the attachment point and

ends when losses reach the detachment point.

79.    An excess-of-loss arrangement does not, however, necessarily result in any actual

"losses" being shifted to the reinsurer, even if the reinsurer begins paying claims.  Paid claims, as

discussed herein, do not establish that the reinsurance agreements provide for true, and

commensurately priced, risk transfer as required by RESPA.  Risk/liability/recourse limiting

features such as those described herein make any claim of "loss" illusory and purposefully

inaccurate.

20

80.    Under accepted accounting and actuarial principles, for a contract to be treated as "real," risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss." *See* CAS[5] Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum,* Winter 2006 ("CAS Research Working Party") at 282-283, attached hereto as Exhibit 7; *see, generally,* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) ("FAS 113") at 7, attached hereto as Exhibit 8.

81.    The likelihood of the reinsurer experiencing any real losses (as opposed to merely paying "claims" from reinsurance premiums/illegal referral payments) under the arrangement depends not only on the amount of losses paid by the private mortgage insurer (i.e. whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer exposes the reinsurer to any real possibility that it may be ***required*** to contribute its ***own*** money when called upon by the primary private mortgage insurer to pay for its share of losses.  The absence of any likelihood that the reinsurer will experience any real losses, in turn, reveals the reinsurance agreement between the reinsurer and primary private mortgage insurer to be a sham.  Such an arrangement does not constitute real, risk-transferring or commensurately priced reinsurance.

**Captive Mortgage Reinsurance Arrangements**

---

[5]      "CAS" refers to the Casualty Actuarial Society.

82.    Lenders produce customers for private mortgage insurers.  In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers. *See Reinsurance Kickbacks* at 3.

83.    However, mortgage lenders such as ABN AMRO Mortgage, seeking to capitalize on the hundreds of millions of dollars their borrowers paid to private mortgage insurers in premiums each year, entered into arrangements with the Defendant Private Mortgage Insurers to establish their own affiliated or "captive" reinsurers and, "[i]n exchange for steering home buyers to the [Defendant Private Mortgage] [I]nsurers,…demand[ed] unjustifiably lucrative [captive] reinsurance deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the lenders and who initially used reinsurance deals as marketing tools). *See Mortgage Kickback Scheme* at 1; *see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage Banking, February 1, 1998, attached hereto as Exhibit 9.

84.    Lenders' captive reinsurers purportedly provide reinsurance primarily or exclusively for loans the lender originates, funds, and/or originates through correspondent lending and which include private mortgage insurance.  Under captive reinsurance arrangements, lenders refer their borrowers to a private mortgage insurer who agrees to enter into a carefully crafted reinsurance contract with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.

85.    Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the

22

appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters." *See Reinsurance Kickbacks* at 1.

86.    This is because some lenders, including ABN AMRO Mortgage, collaborated with private mortgage insurers to create lucrative excess-of-loss and quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk. As *American Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it. The problem was how they split up the risks and rewards of insuring homeowners' mortgages." *See Reinsurance Kickbacks* at 3.

87.    Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts – that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims, if ever necessary. *See, e.g.,* Exhibit 3 at 4, discussing the use of a trust fund.

88.    Premiums are ceded into the supporting trusts on a "book year" basis, as described by the American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all  mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years…. Trust funds for all book years for the particular MI cross- collateralize the entire reinsured obligation to the MI.

*See id.* at 3.

23

89.     Thus, all claims under a reinsurance contract with a particular private mortgage insurer can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year. *See id.* Moreover, upon information and belief, when certain trust reserve requirements are met, the funds in the trust can also typically be released as dividends to the captive reinsurer. Thus, the ceded premiums which are deposited into the trusts remain there until they are paid out to cover claims, paid out to cover administrative expenses incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

90.     Typically, by design, lenders' captive reinsurance contracts with private mortgage insurers, such as ABN AMRO Mortgage's contracts with the Defendant Private Mortgage Insurers, limit the lenders' liability/payment responsibilities under the contracts through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract. *See Reinsurance Kickbacks.*

91.     While the captive reinsurer is facially required to make capital infusions in order to maintain the trust fund's net assets at a level required by state law, this requirement is illusory because the private mortgage insurers have no monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract. *See id.*

92.     Thus, as noted above, the captive reinsurer's potential exposure for payment of reinsurance claims is commonly limited to the amount held in the trust account established for the mortgage insurer – no matter what state laws or regulations, or even other portions of the reinsurance contracts, require. This is accomplished either through concurrent contractual

provisions expressly providing that the captive reinsurer and its affiliates have no exposure for

the failure to adequately fund the trusts or through an unwritten understanding of the parties.

93.   As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could
> fund its stake with incoming premiums.  If the deal went bad, the
> bank could walk away and leave the insurer to cover its losses.
> Conceptually, such arrangements are analogous to letting a
> gambler with $10 in casino chips place a $100 bet at a blackjack
> table on the assumption that he'll win.

*See Reinsurance Kickbacks* at 4.

94.   Should the captive reinsurer choose not to maintain the required funds in the trust

(as ABN AMRO Mortgage decided here), once the trust is depleted, the captive reinsurer bears

no further risk and the mortgage insurer assumes any remaining obligations – even if the funds

available in the trusts were not enough to cover the amount of risk or "losses" the captive

reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the sham

captive reinsurance contracts at issue here from true mortgage reinsurance contracts, and

indicates that the contracts were purposefully structured so as to provide the lender with no true

risk of loss.

95.   Typically, lenders' captive reinsurance arrangements provide yet another layer of

protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only
> from the bank's main reinsurance subsidiary but also from all the
> other funds.  If a reinsurance deal didn't have enough money to
> pay its obligations, the bank could abandon it and leave the
> mortgage insurer with the unpaid bill.

> To carry on the casino analogy above, it would be as if the gambler
> with $10 in chips were allowed to make that same $100 bet at ten
> different blackjack tables, collecting on the winning bets and
> renouncing the losers.

25

*See id.*

96.     Lenders have aggressively pursued such arrangements with private mortgage insurers. As *American Banker* recently reported, "[e]ven as insurers complained they couldn't afford the escalating cost of the reinsurance payments, banks threatened or punished companies that balked at providing them...." *See id.*

97.     Captive mortgage reinsurance arrangements such as ABN AMRO Mortgage's arrangements with the Private Mortgage Insurer Defendants raise obvious RESPA kickback/fee-splitting problems. Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the private mortgage insurers. The private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

98.     As opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described above, to funnel such unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance subsidiaries.

99.     As actuarial firm Milliman, Inc. acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to *receiving a commission or profit sharing equal to a percentage of premium*...." *See* Exhibit 5.

**HUD's Concern About RESPA Anti-Kickback/Illegal**
**Fee Splitting Violations Under Captive Reinsurance Arrangements**

100.    Concerned that captive reinsurance arrangements would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued an advisory letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA anti-kickback violations. *See* Exhibit 10 hereto.

101.    The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services." *Id.* at 3.

102.    The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk." In determining whether there is a real transfer of risk, HUD warned that "[t]he reinsurance transaction cannot be a sham under which premium payments...are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *Id.* at 6.

103.    The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim." *Id.*[6]

104.    The HUD letter contrasts the excess-of-loss method of captive mortgage reinsurance, stating that excess-of-loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

---

[6]     As noted above, even quota share arrangements do not constitute real or commensurately priced reinsurance if the underlying reinsurance contracts contain certain risk-limiting features that essentially protect the lender and its captive reinsurer from assuming true risks of loss.

> [I]f the band of the reinsurer's potential exposure is such that a
> reasonable business justification would motivate a decision to
> reinsure that band. Unless there is a real transfer of risk, no real
> reinsurance services are actually being provided. In either case,
> the premiums paid...must be commensurate with the risk.

*Id.* In other words, even if there is some transfer of risk, the reinsurance arrangement will still

violate RESPA unless the amount paid to the lender's captive reinsurer (*e.g.,* the premiums

ceded) is commensurate with the risk transferred.

### ABN AMRO Mortgage's Captive Reinsurance
### <u>Arrangements with the Defendant Private Mortgage Insurers</u>

105. During the Class Period, in connection with the hundreds of millions of dollars in

home loans originated by, funded by and/or originated through correspondent lending by ABN

AMRO Mortgage, many of its borrowers paid for private mortgage insurance.

106. Also during the Class Period, Defendant AAMBG Reinsurance was a party to

captive reinsurance arrangements with each of the Defendant Private Mortgage Insurers.

Pursuant to these arrangements, ABN AMRO Mortgage referred borrowers to, and, upon

information and belief, allocated referrals on a rotating or other systematic basis having nothing

to do with quality of service, price, reputation, performance or other appropriate metric among,

the Defendant Private Mortgage Insurers who, for their part, agreed to reinsure with AAMBG

Reinsurance under carefully crafted reinsurance contracts that provided for no true transfer of

risk of reinsurance losses to AAMBG Reinsurance.

107. Upon information and belief, AAMBG Reinsurance entered into reinsurance

contracts solely with respect to loans originated by, funded by, and/or originated through

correspondent lending by ABN AMRO Mortgage during the Class Period. Further, such

agreements were in the form of aggregate excess-of-loss reinsurance contracts or "purported" quota share reinsurance contracts.

108. Under each of ABN AMRO Mortgage's excess-of-loss and quota share captive reinsurance arrangements, the Defendant Private Mortgage Insurer pays AAMBG Reinsurance a percentage of the premiums paid by borrowers on a particular pool of loans; in return, AAMBG Reinsurance purportedly agrees to assume a portion of the insurer's risk of loss with respect to the loans involved.

109. In fact, each of Defendants' carefully-crafted reinsurance contracts does not provide for "real transfer of risk" and, under any analysis, are not "commensurately" priced.

110. Under its reinsurance contracts, AAMBG Reinsurance established a separate trust fund for each Private Mortgage Insurer into which the Private Mortgage Insurer deposited the contractually-determined ceded portions of the premiums that it collected from borrowers. AAMBG Reinsurance is facially required, pursuant to its contracts with the Private Mortgage Insurers, to maintain, through, *inter alia,* capital infusions and ceded premiums, each trust fund's net assets at a level required by state law to fund claims made under the reinsurance contracts.

111. For the reasons described above, AAMBG Reinsurance's potential exposure for payment of reinsurance claims is limited to the amount held in the trust account established for the mortgage insurer – effectively insulating Defendants from liability for failing to maintain the trusts adequately to pay claims and leaving the Private Mortgage Insurers with no recourse.

112. Consequently, ABN AMRO Mortgage's captive reinsurance arrangements do not constitute real, risk-transferring reinsurance between AAMBG Reinsurance and the Defendant Private Mortgage Insurers.

113.    As HUD Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, Gary M. Cunningham, noted during testimony before the United States Congress' House Committee on Financial Services (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

*See* April 26, 2006 testimony of Gary M. Cunningham, attached hereto as Exhibit 11.

114.    As reflected in the table below, from the beginning of 2004 through the end of 2010, AAMBG Reinsurance collected from the Private Mortgage Insurers at least **$184 million** as its "share" of borrower's private mortgage insurance premiums. In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only slightly over $4 million, as depicted below:



**AAMBG Reinsurance**
**Aggregate Premiums Received and Claims Paid 2004-2010**
US Dollars in 000's
$184,258    $4,355

115.   As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse." *See Reinsurance Kickbacks* at 1.

116.   Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history. *See, e.g.,* Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown,* CCH Mortgage Compliance Guide and Bank Digest (2008), attached hereto as Exhibit 12.  Thus, it is not at all surprising that slightly more claims were paid from the trusts during 2009 and 2010.

117.   Further, paid claims, as discussed herein, do not establish that the reinsurance contracts at issue constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA.  Even after paying some additional claims during 2009 and 2010, due to the *structure* of the reinsurance agreements, Defendants continued to carry no true risk of loss and the premiums received by AAMBG Reinsurance far exceeded any risk that AAMBG Reinsurance purportedly assumed.

118.   Payment of claims from the reinsurance trusts to the Private Mortgage Insurers does not constitute "losses" to the captive reinsurer.  This is because the reinsurance contracts are designed in such a manner as to ensure that the reinsurer bears no risk of loss.  The reinsurer is "playing with the house's money," in that it will either (a) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in "reinsurance claims," or (b) have the option to simply "walk-away" from its reinsurance obligations in the event that it is ever called upon to pay more in reinsurance claims than is available in the trust accounts.

119.    In December 1992, the Financial Accounting Standards Board issued FAS 113, entitled "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts" (a copy of FAS 113 is attached hereto as Exhibit 8).  FAS 113 defined risk transfer requirements and established the conditions required for a contract with a reinsurer to be accounted for as reinsurance, as did the substantially similar Statement of Statutory Accounting Principle (SSAP) 62.  *Id.*; *see also* David L. Ruhm and Paul J. Brehm, *Risk Transfer Testing of Reinsurance Contracts: A Summary of the Report by the CAS Research Working Party on Risk Transfer Testing*, Variance Journal, Issue 1, Volume 1, at 10 ("*Risk Transfer Testing*"), attached hereto as Exhibit 13.

120.    Under FAS 113, "[i]n order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance]…it must transfer insurance risk from an insurer to a reinsurer."  Exhibit 7 at 283.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

   a.    The reinsurer must assume "substantially all" of the underlying insurance risk, or

   b.    The reinsurer must assume "significant" risk; that is, it must be "reasonably possible" that the reinsurer can suffer a "significant loss."

*See* FAS 113; *see also Risk Transfer Testing*, at 10.  With respect to the first test identified above, it is appropriate to consider whether "the downside risk assumed by the reinsurer is essentially the same as that faced by the cedant with respect to the original unreinsured portfolio."  *Risk Transfer Testing* at 11.  Given the various above-described risk limitation features in each of ABN AMRO Mortgage's reinsurance contracts, only the second test identified by FAS 113 is relevant here.  Accordingly, in order for ABN AMRO Mortgage's reinsurance contracts to meet the risk transfer requirement set forth in FAS 113, its captive

reinsurer must assume "significant" risk and it must be "reasonably possible" that the reinsurer can suffer a "significant loss."

121.    In a deposit accounting/no risk transfer arrangement, loss to the Private Mortgage Insurer is not equivalent to loss to the reinsurer – payment from a reinsurance trust to a Private Mortgage Insurer under a deposit accounting/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  The mere payment of "claims" under a "deposit accounting"/reinsurance contract is not equivalent to a "loss."  This is because, as long as the claims are being paid solely from the ceded premiums paid by the Private Mortgage Insurers, the reinsurer is not experiencing any losses.  It is not paying claims or suffering losses from its *own* capital.

122.    The millions of dollars paid by the Defendant Private Mortgage Insurers and collected by ABN AMRO Mortgage through its captive reinsurer have clearly not been commensurate to its actual risk exposure.  The Defendant Private Mortgage Insurers have paid, and ABN AMRO Mortgage has received, hundreds of millions of dollars in ceded premiums, while ABN AMRO Mortgage has borne little or no risk of loss.

123.    In reality, Defendants' captive reinsurance arrangements were and are sham transactions providing for the transfer of kickbacks and unearned fees in violation of RESPA.

124.    The money which ABN AMRO Mortgage collected from the Defendant Private Mortgage Insurers through AAMBG Reinsurance far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer.  The amounts paid were simply disguised kickbacks to ABN AMRO Mortgage for the referral of borrowers to the Defendant Private Mortgage Insurers.

33

125.    These arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders. Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers. As a result, private mortgage insurance premiums incorporate the payment of such kickbacks – to the detriment of consumers and in contravention of the stated purpose of RESPA. Nevertheless, RESPA does not require that Plaintiff or Class members suffer an overcharge as a prerequisite to a claim. It is sufficient that the real estate settlement process is unlawfully tainted by virtue of secretive kick-backs, without regard to any actual overcharge.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

126.    Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule. For Plaintiffs and Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply. Plaintiffs and members of the Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims until, at the earliest, September of 2011. Further, Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purpose, self-concealing. For these reasons, any delay by the members of the Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

127.    Due to the complex, actively hidden/misrepresented, undisclosed and self-concealing nature of Defendants' scheme to provide for the payment of illegal kickbacks from the Private Mortgage Insurers to ABN AMRO Mortgage, Plaintiffs and Class members whose

claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

128.    As *American Banker* reported, "[m]aking matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly disclose the reinsurance agreements*, another RESPA violation." *See Reinsurance Kickbacks* at 1 (emphasis added). In fact, HUD investigators reported to the Department of Justice that "[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals.... In some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'" *Id.* at 6.

129.    This complex action is dissimilar to a simple RESPA case where, for example, an attentive borrower may determine – from a careful examination of his or her HUD-1 settlement statement – that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider. Rather, the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for the average homeowner to follow.

130.    Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel. Plaintiffs and the Class members had no basis upon which to investigate the validity of the undisclosed payments from the Defendant Private Mortgage Insurers to AAMBG Reinsurance for purported reinsurance. Any delay by Plaintiffs and Class members was excusable because they did not discover, and reasonably could not have discovered, Defendants' conduct as alleged herein.

131.    Once Plaintiffs discovered the underlying basis for the claims asserted herein, Plaintiff Joseph Rulison contacted CitiMortgage in an attempt to obtain information concerning his ABN AMRO Mortgage loan and AAMBG Reinsurance.   Specifically, Plaintiff Joseph Rulison called CitiMortgage on March 13, 2012.   Despite his efforts, Plaintiff Joseph Rulison was told by a representative of CitiMortgage that no information was available concerning the captive reinsurance program.

132.    Further, Defendants engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein and made false representations about the nature of their reinsurance arrangements.   Such acts are separate and distinct from the conduct violative of RESPA.

133.    ABN AMRO Mortgage used its form mortgage documents, disclosures of affiliated business arrangements, and the entire artifice of a seemingly legitimate business arrangement, to affirmatively mislead Class members about the relationship between the reinsurer, AAMBG Reinsurance, and the lender, and to represent that, rather than a kickback or unearned fee, any payments exchanged between the affiliated businesses, or given to them from the Private Mortgage Insurer Defendants through referral, were for actual services rendered.

134.    Even when some industry analysts and ratings agencies questioned the captive reinsurance deals, banks *and* insurers publicly maintained that they met the standards set forth in the 1997 HUD policy letter. *See Reinsurance Kickbacks* at 2.

135.    Defendants also actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators. As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign off
> on the structures.  To judge whether the reinsurance agreements

were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.

"Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

See id. at 4.

136.    Putative Class members thus did not possess and could not have possessed sufficient information to put them on notice of the true nature of ABN AMRO Mortgage's captive reinsurance arrangements. The average homebuyer is neither an insurance expert nor a reinsurance expert. Simply being told that ABN AMRO Mortgage may enter into captive reinsurance relationships is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that the buyer's rights under RESPA may have been violated. See, e.g., id. at 7 (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess"). This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

137.    Similarly, it is beyond unrealistic to expect members of the Class to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurer Defendants did not begin until around 2007, years after the transactions came into existence. See id. at 2, 6 (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

138.    Upon information and belief, ABN AMRO Mortgage intentionally designed any disclosure that it provided to its borrowers in such a manner as to conceal from them information sufficient to put them on notice of the underlying basis for their claims and affirmatively misrepresent the nature of Defendants' conduct.  Class members were not put on notice of ABN AMRO Mortgage's wrongdoing.  For instance, ABN AMRO Mortgage did not disclose to borrowers that its captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by AAMBG Reinsurance.

139.    Defendants' misrepresentations about the legitimacy of their captive reinsurance arrangements as *bona fide* in various standardized mortgage and closing documents are separate and distinct acts of concealment that misled Plaintiffs and members of the Class.

140.    Further, AAMBG Reinsurance and other captive reinsurance companies incorporated in "captive-friendly" states such as Vermont are not required to file the type of detailed annual reports with the NAIC usually required of commercial insurance companies. *See* Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005), attached hereto as Exhibit 14 ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator...."); *see also Mortgage Kickback Scheme* at 5 (noting that Vermont ranks among the world's top three domiciles for captive reinsurers, along with Bermuda and the Cayman Islands).  Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on ABN AMRO Mortgage's captive reinsurer.  One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

38

141.   HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question, overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes.

*See id.* (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statement [sic] that did not conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

142.   Class members exercised due diligence by fully participating in their loan transactions.   Because of Defendants' actions and because of the nature of the reinsurance scheme, Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

143.   ABN AMRO Mortgage provided misleading and false information to Plaintiffs and the Class, thus affirmatively acting to conceal its unlawful kickback scheme. By funneling kickbacks through AAMBG Reinsurance and representing that such payments were for services actually performed, rather than referral fees, ABN AMRO Mortgage acted to conceal and prevent Plaintiffs from discovering the underlying basis for this action.  Any delay by Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be grossly inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

### CLAIMS FOR RELIEF

## COUNT ONE
### (Violation of RESPA, 12 U.S.C. § 2607)

144.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

145.   Throughout the Class Period, Defendants provided "settlement services" and/or engaged in business incident to real estate settlement services with respect to "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).  Plaintiffs and the Class obtained federally-related residential mortgage loans through ABN AMRO Mortgage and collectively paid hundreds of millions of dollars for private mortgage insurance premiums in connection with their real estate closings.

146.   The amounts paid by the Defendant Private Mortgage Insurers and accepted by ABN AMRO Mortgage through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

147.   Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to AAMBG Reinsurance under carefully crafted excess-of-loss and purported quota share reinsurance contracts.

148.   These ceded premiums: (a) were not for services actually furnished or performed and/or (b) exceeded the value of such services.

149.   The millions of dollars paid by the Defendant Private Mortgage Insurers and accepted by ABN AMRO Mortgage through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between ABN AMRO Mortgage and the Defendant Private Mortgage Insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

150.    In connection with transactions involving federally-related mortgage loans, the Defendant Private Mortgage Insurers gave, and ABN AMRO Mortgage accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by the Defendant Private Mortgage Insurers and accepted by ABN AMRO Mortgage through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by ABN AMRO Mortgage's customers.  AAMBG Reinsurance participated in the scheme and served as the direct party to which the split was paid.  AAMBG Reinsurance agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and the Class.

151.    Plaintiffs and the Class were subjected to settlement services and/or business incident to real estate settlement services tainted by naked kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme.   Defendants' reinsurance arrangements with the Defendant Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

152.    First, Plaintiffs and the Class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.  Congress bestowed upon Plaintiffs and the Class a right to a real estate settlement free from unlawful kickbacks and unearned fees and has expressly provided for private enforcement of this protected right by empowering consumers to recover

statutory damages from offending parties without proof of an overcharge. *See* 12 U.S.C. §§ 2601, 2607(d)(2).

153.    Plaintiffs allege that the Defendant Private Mortgage Insurers have given, and ABN AMRO Mortgage has accepted, unlawful kickback payments and/or an unearned portion of settlement service charges and/or charges for business incident to real estate settlement services – private mortgage insurance premiums – in violation of RESPA. Defendants' scheme resulted in a limitation on both settlement service choice and competition. ABN AMRO Mortgage eliminated competition among providers of private mortgage insurance by requiring its borrowers to purchase private mortgage insurance from one of the Defendant Private Mortgage Insurers with whom it had a captive reinsurance arrangement. Referred borrowers were allocated to one of the private mortgage insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each private mortgage insurer in return for the kickbacks.

154.    Further, ABN AMRO Mortgage did not disclose the true nature of the reinsurance arrangements to Plaintiffs. Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers. *See Carter v. Welles-Bowen Realty, Inc.,* 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

155.    Moreover, though not necessary to prevail on their claims, Plaintiffs and the Class were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct. Congress has already determined that the ***aggregate*** effect of an

unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services. *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result…(2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.").

156.   Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums. Because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage and the private mortgage insurers' unlawful kickbacks to lenders. In other words, under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongfully included payments for both: (a) actual mortgage insurance services, and (b) payments unlawfully kicked back to ABN AMRO Mortgage's captive reinsurer that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

157.   The specific harms identified above have been recognized as widespread in the mortgage lending marketplace. *See generally Mortgage Kickback Scheme*; *Reinsurance Kickbacks*. As the *Reinsurance Kickbacks* article by *American Banker* states, according to the Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced borrowers to buy more expensive policies than they needed. "'Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan,' the presentation concluded." *See Reinsurance Kickbacks* at 6.

43

158.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C.2607(a) and (b).  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

159.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

COUNT TWO

(COMMON-LAW RESTITUTION/UNJUST ENRICHMENT)

160.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

161.    Plaintiffs have conferred a substantial benefit upon Defendants which has been appreciated by Defendants.  During the Class Period, the Defendant Private Mortgage Insurers collected and wrongfully paid to ABN AMRO Mortgage millions of dollars as ABN AMRO Mortgage's unlawful split or share of the private mortgage insurance premiums paid by Plaintiffs and Class members.

162.    The amounts collected and ceded to AAMBG Reinsurance as purported reinsurance premiums were accepted and retained by ABN AMRO Mortgage under circumstances such that it would be inequitable for ABN AMRO Mortgage to retain the benefit of such payments.

163.    The Private Mortgage Insurers were guaranteed a steady stream of business in return for ceding portions of the premiums they received from borrowers with respect to the loans involved in Defendants' captive reinsurance scheme, and they were unjustly enriched through receipt of this guaranteed stream of business.

44

164.    As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

165.    Further, Plaintiffs and the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.      Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as Class Representatives, and Plaintiffs' counsel as Lead Counsel for the Class;

B.      Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.      Awarding Plaintiffs and the Class statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.      Granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.      Granting Plaintiffs and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Class; and

F.     Granting Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

Dated: April 19, 2012

Respectfully submitted,

/s/

**THE FLEISCHMAN LAW FIRM**
Keith M. Fleischman
565 Fifth Avenue, Seventh Floor
New York, NY 10017
Tel: 212-880-9567
Fax: 917-591-5245

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Shanon J. Carson
Douglas M. Risen
Russell D. Paul
Jacob M. Polakoff
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

**JOSEPH A. WEEDEN, ESQ.**
18 Kings Cross Circle
Doylestown, PA 18901
Tel: 919-724-6433
Fax: 215-230-9495

**Attorneys for Plaintiffs**

46